# EXHIBIT 1

CIRCUIT COURT FOR BALTIMORE CITY
Xavier A. Conaway
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389

W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
                           Case Number: 24-C-23-002528 OT
                           C I V I L
STATE OF MARYLAND vs 3M COMPANY, 3M CENTER

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

       To: 3M COMPANY, 3M CENTER
Serve On: CSC-LAWYERS INCORPORATING
          7 ST. PAUL STREET, SUITE 820
          Baltimore, MD 21202


     You are hereby summoned to file a written response by pleading or motion,
within 30  days after service of this summons upon you, in this court, to
the attached Complaint filed by:    STATE OF MARYLAND
                                    200 SAINT PAUL PLACE
                                    Baltimore, MD 21202

WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of
Maryland

Date Issued:   05/31/23

                        Xavier A. Conaway
                        Clerk of the Circuit Court, per


To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT
BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

CIRCUIT COURT FOR BALTIMORE CITY
Xavier A. Conaway
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389


W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
Case Number: 24-C-23-002528 OT
C I V I L
STATE OF MARYLAND vs 3M COMPANY, 3M CENTER

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

     To: TYCO FIRE PRODUCTS LP
Serve On: THE CORPORATION TRUST, INC
         2405 YORK ROAD, SUITE 201
         Lutherville Timonium, MD 21093


    You are hereby summoned to file a written response by pleading or motion, within 30   days after service of this summons upon you, in this court, to the attached Complaint filed by:   STATE OF MARYLAND
                             200 SAINT PAUL PLACE
                             Baltimore, MD 21202

WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of Maryland


Date Issued:   05/31/23

Xavier A. Conaway
Clerk of the Circuit Court, per


To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

CIRCUIT COURT FOR BALTIMORE CITY
Xavier A. Conaway
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389


W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
Case Number: 24-C-23-002528 OT
C I V I L
STATE OF MARYLAND vs 3M COMPANY, 3M CENTER

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

       To: CHEMGUARD, INC
Serve On: WAEL T. ELKOSHAIRI
          1 KEYSTONE COURT
          Gaithersburg, MD 20878


     You are hereby summoned to file a written response by pleading or motion,
within 30  days after service of this summons upon you, in this court, to
the attached Complaint filed by:    STATE OF MARYLAND
                                    200 SAINT PAUL PLACE
                                    Baltimore, MD 21202

   WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of
   Maryland

Date Issued:   05/31/23

Xavier A. Conaway
Clerk of the Circuit Court, per


To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT
BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

## IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| STATE OF MARYLAND,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202 | * <br><br>* <br><br>* |
| *Plaintiff,* | * |
| v. | * |
| 3M COMPANY,<br>3M Center<br>St. Paul, Minnesota 55144-1000, | * <br><br>* <br><br>* |
| Serve on:<br>CSC-Lawyers Incorporating<br>Service Company<br>7 St. Paul Street<br>Suite 820,<br>Baltimore, Maryland 21202 | * <br><br>* <br><br>* <br><br>* |
| *and* | * |
| ARKEMA INC.,<br>900 First Avenue, King of Prussia<br>Pennsylvania 19406, | * <br><br>* |
| Serve on:<br>CSC-Lawyers Incorporating<br>Service Company<br>7 St. Paul Street, Suite 820<br>Baltimore, Maryland 21202 | * <br><br>* <br><br>* |
| *and* | * |
| BASF CORPORATION,<br>100 Park Avenue, Florham Park<br>New Jersey 07932, | * <br><br>* <br><br>* |

**FILED**

**MAY 3 0 2023**

CIVIL DIV.
Case N~~RC~~  ~~COURT FOR~~
~~BALTIMORE~~ **CITY**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Serve on:                                          *
The Corporation Trust Company
Corporation Trust Center                           *
1209 Orange Street
Wilmington, Delaware 19801                          *

*and*                                              *

BUCKEYE FIRE EQUIPMENT                             *
COMPANY,
110 Kings Road, Kings Mountain                     *
North Carolina 28086,
                                                   *

    Serve on:                                      *
    Kevin J. Bower
    110 Kings Road
    Kings Mountain, North Carolina                 *
    28086
                                                   *

*and*                                              *

CARRIER FIRE & SECURITY                            *
AMERICAS CORPORATION,
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418,                 *

    Serve on:                                      *
    United Agent Group, Inc.
    801 US Highway 1                               *
    North Palm Beach, Florida 33408
                                                   *

*and*                                              *

CARRIER GLOBAL                                     *
CORPORATION,
13995 Pasteur Boulevard
Palm Beach Gardens, Florida 33418,                 *

    Serve on:                                      *
    United Agent Group, Inc.
    801 US Highway 1                               *
    North Palm Beach, Florida 33408
                                                   *

2

*and*                                                    *

CHEMGUARD, INC.,                                         *
One Stanton Street
Marinette, Wisconsin 54143-2542,                        *

    Serve on:                        *
    Wael T. Elkoshairi
    1 Keystone Court                  *
    Gaithersburg, Maryland 20878
                                                        *

*and*                                                   
                                                        *

CORTEVA, INC.,                                          *
974 Centre Road
Wilmington, Delaware 19805,                             *

    Serve on:
    The Corporation Trust, Inc.        *
    2405 York Road, Suite 201
    Lutherville Timonium, Maryland     *
    21093-2264
                                                        *

*and*                                                   
                                                        *

DUPONT DE NEMOURS, INC.,                                *
974 Centre Road
Wilmington, Delaware 19805,                             *

    Serve on:
    The Corporation Trust Company      *
    Corporation Trust Center
    1209 Orange Street                 *
    Wilmington, Delaware 19801
                                                        *

*and*                                                   
                                                        *

DYNAX CORPORATION,                                      *
79 Westchester Avenue
Pound Ridge, New York 10576,                            *

                                                        *

3

Serve on:                                              *
CN Search L.L.C.
28 Crystal Street                                      *
Wethersfield, Connecticut 06109
                                                       *
*and*
                                                       *
EIDP, INC., F/K/A E.I. DU PONT
DE NEMOURS AND COMPANY,                                *
974 Centre Road
Wilmington, Delaware 19805,                            *

   Serve on:                           *
   The Corporation Trust, Inc.
   2405 York Road, Suite 201             *
   Lutherville Timonium, Maryland
   21093-2264                            *

*and*                                                  *

NATIONAL FOAM, INC.,                                   *
141 Junny Road
Angier, North Carolina 27501,                          *

   Serve on:                           *
   CT Corporation System
   160 Mine Lake Ct, Suite 200           *
   Raleigh, North Carolina 27615

                                                       *
*and*
                                                       *
THE CHEMOURS COMPANY,
1007 Market Street                                     *
Wilmington, Delaware 19899,

                                                       *
   Serve on:
   The Corporation Trust Inc.            *
   351 West Camden Street
   Baltimore, Maryland                   *
   21201-7912

                                                       *

4

*and*          *

TYCO FIRE PRODUCTS LP,     *
One Stanton Street
Marinette, Wisconsin 54143-2542,    *

     Serve on:          *
     The Corporation Trust, Inc.
     2405 York Road, Suite 201     *
     Lutherville Timonium, Maryland
     21093-2264          *

*Defendants.*         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT

Plaintiff, the State of Maryland (the "State"), by and through Anthony G. Brown, Attorney General of Maryland, and counsel, on behalf of the Maryland Department of Environment (the "Department" or "MDE"), the Maryland Department of Health ("MDH"), and the Maryland Department of Natural Resources ("DNR"), files this Complaint against the above-named Defendants and in support thereof alleges as follows:

## INTRODUCTION

1. Through this action, the State seeks damages, remediation, restoration, and other relief to address the environmental contamination and public health harm caused by Defendants' use of toxic per- and polyfluoroalkyl substances ("PFAS") in aqueous film-forming foam ("AFFF").

2. For decades, Defendants knew of the dangers of PFAS, including the perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") that were present in AFFF and discharged into the environment during firefighting training and

5

emergency response activities at military bases, airports, fire training academies, refinery and terminal facilities, and other locations, including within Maryland.

3.      Despite this knowledge, Defendants continued to manufacture, market, and sell their AFFF to the United States government, the State, local governments, businesses, and others for use in Maryland and elsewhere, without disclosing the significant risks of these chemicals to human health and the environment, all in the pursuit of enormous profits.

4.      The U.S. Environmental Protection Agency ("EPA") has concluded that exposure to PFAS may lead to significant negative health effects, including but not limited to: "Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; developmental effects or delays in children including low birth weight, accelerated puberty, bone variations, or behavioral changes; increased risk of some cancers, including prostate, kidney, and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; [and] increased cholesterol levels and/or risk of obesity." *Our Current Understanding of the Human Health and Environmental Risks of PFAS,* Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited May 22, 2023).

5.      Although Defendants knew that their AFFF and PFAS-containing fluorochemicals and fluorosurfactants used to make AFFF (collectively, "AFFF Products") would release PFAS into the environment, harm people and natural resources, and require immense costs to remediate, they concealed information about the chemicals' negative

6

health effects and affirmatively contradicted it in public statements and marketing campaigns to enrich themselves.

6.     Defendants' tortious and unlawful acts and omissions have caused significant PFAS contamination of the State's drinking water, groundwater, surface water, soil, sediment, wildlife, other natural resources, and property held in trust or otherwise owned by the State. These toxic and persistent "forever chemicals" require massive effort and expense to investigate, treat, and remove from the State's natural resources, property held in trust, and property otherwise owned by the State.

7.     Because of Defendants' concealment, the State is only now in a position to begin to understand the extent of this PFAS contamination in Maryland. Addressing the threat to human health and the environment that Defendants have caused will require substantial effort and expense focused on investigating, treating, and remediating PFAS contamination.     Defendants that created and profited from the creation of this environmental hazard, and not Maryland's citizens, must pay to address the PFAS contamination throughout the State.

8.     To date, investigations have focused on military bases in Maryland, revealing multiple sites where AFFF was used and that are contaminated with PFAS. Several military bases, including the Naval Research Lab, Chesapeake Beach Detachment, and Joint Base Andrews, are confirmed sources of PFAS contamination. AFFF-related contamination at these sites has migrated to and polluted groundwater and surface water and has adversely affected biota in the surrounding areas. Further investigation will

7

identify additional sites and resources affected by AFFF Products, likely including airports, refineries, terminals, ports, and firefighting training sites.

9.      The State brings this action to hold Defendants accountable for the harms done to Maryland, its citizens, and its natural resources from Defendants' AFFF Products.

10.     Through this action, the State is not seeking damages, remediation, restoration or any other relief with respect to any contamination from PFAS that is not related to the manufacture and use of AFFF, as damages from those compounds that are not from the manufacture and use of AFFF are the subject of a separate action.

## PARTIES

### *The State of Maryland as Plaintiff*

11.     The State brings this action (a) directly in its own right, (b) in its *parens patriae* capacity, and (c) as trustee of Maryland's natural resources.

12.     The State holds significant direct property interests in natural resources of the State and State-owned lands, but also has an interest as a sovereign and natural resource trustee in protecting the natural resources of the State from contamination.    The contamination of the natural resources of the State by PFOS and PFOA constitutes injury to the persons and property of the State's citizens and to the natural resources of the State, which are held in trust by the State on behalf of all its citizens.   The State may for the common good exercise all the authority necessary to protect its interests and those of its citizens.

13.     The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust, i.e., the natural resources, for the beneficiaries of the trust, i.e., the

8

public. Protection of the natural resources of the State is a matter of public concern in which the State has an interest apart from that of particular individuals who may be affected. Pollution of the natural resources of the State with PFOS and PFOA has negatively affected a substantial segment of the State and its population.

14.     The State brings this action pursuant to its police powers, which include but are not limited to, its powers to prevent and abate pollution of the natural resources of the State, to prevent and abate nuisances, and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

15.     The State, through its Attorney General, also brings this action under Title 9 of the Environment Article, which empowers the Secretary of MDE, through the Attorney General, to bring suit against any person who "discharge[s] any pollutant into the waters of this State" without a permit. Md. Code Ann., Env't §§ 9-322, 9-339(a).

16.     The responsibilities of the Attorney General include the investigation, commencement, and prosecution of civil suits on the part of the State. *See* Maryland Constitution, Art. V, § 3. "[T]he Attorney General has general charge of the legal business of the State." Md. Code Ann., State Gov't § 6-106.

17.     As a result of Defendants' acts and omissions as alleged herein, the State has suffered and will continue to suffer injuries to its natural resources and has incurred and will continue to incur costs to define the extent of PFOS and PFOA contamination

9

throughout the State, as well as to monitor, treat, remediate, and remove PFOS and PFOA and to provide oversight of such activities.

***Defendants***

18.     At all relevant times, Defendants together controlled all, or substantially all, of the market for AFFF in Maryland.

19.     Defendant 3M Company is a Delaware Corporation qualified to do business in Maryland. Its principal place of business is 3M Center, St. Paul, Minnesota 55144-1000. 3M manufactured, marketed, and sold AFFF that was used or otherwise released in the State.

20.     Defendant Arkema Inc. is a Pennsylvania corporation qualified to do business in Maryland. Its principal place of business is at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have manufactured, marketed, and/or sold fluorosurfactants used to manufacture AFFF that was used and otherwise released in the State.

21.     Defendant BASF Corporation is a Delaware corporation qualified to do business in Maryland. Its principal place of business is at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. f/k/a Ciba Specialty Chemicals Corporation. On information and belief, Ciba Inc. manufactured, marketed, and/or sold fluorosurfactants used to manufacture AFFF that was used and otherwise released in the State.

10

22.    Defendant Buckeye Fire Equipment Company is an Ohio corporation. Its principal place of business is at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye has manufactured, marketed, and/or sold AFFF that was used or otherwise released in the State.

23.    Defendant Chemguard, Inc. is a Texas corporation that has forfeited its right to do business in Maryland. Its principal place of business is at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard has manufactured, marketed, and/or sold AFFF containing PFAS that was used or otherwise released in the State.   Further, Chemguard has manufactured, marketed, and/or sold fluorosurfactants used to manufacture AFFF that was used or otherwise released in the State.

24.    Defendant Dynax Corporation is a Delaware corporation. Its principal place of business is at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has manufactured, marketed, and/or sold fluorosurfactants used to manufacture AFFF that was used or otherwise released in the State.

25.    Defendant EIDP, Inc. ("Old DuPont"), f/k/a E. I. du Pont de Nemours and Company, is a Delaware corporation qualified to do business in Maryland.  Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805.  Old DuPont has manufactured, marketed, and/or sold fluorochemicals and/or fluorosurfactants used to manufacture AFFF that was used or otherwise released in the State.

26.    Defendant The Chemours Company is a Delaware corporation qualified to do business in Maryland.  Its principal place of business is at 1007 Market Street, Wilmington, Delaware 19899.  In 2015, Old DuPont spun off its performance chemicals

11

business to Chemours, along with vast environmental liabilities. Chemours has manufactured, marketed, and/or sold fluorosurfactants used to manufacture AFFF that was used or otherwise released in the State.

27.     Defendant Corteva, Inc. is a Delaware corporation qualified to do business in Maryland. Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805. In 2019, DuPont de Nemours, Inc. spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities, including those relating to PFAS.

28.     Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont Inc., is a Delaware corporation. Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic liabilities and assets to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities, including those relating to PFAS. New DuPont does business throughout the United States, including in Maryland.

29.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation. Its principal place of business is at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier is the indirect owner of Kidde-Fenwal, Inc.,[1] which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam

---

[1] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde-Fenwal, Inc.*, Case No. 23-10638-LSS (D. Del. Bankr.). In light of the automatic stay of claims against Kidde-Fenwal, Inc. pursuant to 11 U.S.C. § 362, Kidde-Fenwal, Inc. is not named as a defendant herein.

System, Inc.) (collectively, "Kidde"). Kidde manufactured, marketed, and/or sold AFFF that was used or otherwise released in the State. Before it was owned by Carrier, United Technologies Corporation was Kidde's ultimate parent company. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement By And Among United Technologies Corporation, Carrier Global Corporation and Otis Worldwide Corporation, Carrier assumed certain liabilities, including those related to the business operated by Kidde. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier conducted business throughout the United States, including in Maryland. Carrier, through Kidde, manufactured, marketed, and/or sold AFFF that was used and otherwise released in the State.

30. Defendant Carrier Fire & Security Americas Corporation is a Delaware corporation. Its principal place of business is at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde. Following the spinoff transaction described above, Carrier Fire is also the successor in interest to UTC Fire & Security Americas Corporation, Inc., which previously owned Kidde as a subsidiary prior to April 2020. Carrier Fire, through Kidde, manufactured, marketed, and/or sold AFFF that was used or otherwise released in the State.

31. Defendant National Foam, Inc. is a Delaware corporation. Its principal place of business is at 141 Junny Road, Angier, North Carolina 27501. National Foam

13

manufactures the Angus brand of products and is the successor in interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam/Angus Fire has manufactured, marketed, and/or sold AFFF used and otherwise released in the State.

32.     Defendant Tyco Fire Products LP is a Delaware limited partnership qualified to do business in Maryland. Its principal place of business is at One Stanton Street, Marinette, Wisconsin 54143-2542. Tyco manufactures the Ansul brand of products and is the successor in interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul manufactured, marketed, and/or sold AFFF that was used and otherwise released in the State.

<strong>JURISDICTION AND VENUE</strong>

33.     This Court has subject matter jurisdiction over this matter under § 1-501 of the Courts and Judicial Proceedings Article and Maryland Rule 2-305(b) because this civil action seeks and demands money damages in excess of $75,000.00.

34.     This Court has personal jurisdiction over Defendants because they will be served with process in Maryland; are organized under the laws of Maryland; maintain their principal place of business in Maryland; transact business in Maryland; perform work in Maryland; contract to supply goods in Maryland; manufacture products or performed services in Maryland; caused tortious injury in Maryland; engage in persistent courses of conduct in Maryland; derive substantial revenue from manufactured goods, products, or services used or consumed in Maryland; and/or have interests in or use real property in Maryland.

14

35.     Venue is proper in this Court as to all Defendants under §§ 6-201 and 6-202 of the Courts and Judicial Proceedings Article.

## FACTUAL ALLEGATIONS

**A.      The Harmful Impacts of AFFF on the Environment, Animals, and Human Health**

36.     AFFF is a fire-suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires, and is routinely used to train firefighters and test firefighting equipment.

37.     When used as intended during a firefighting event or training exercise, AFFF can cause hundreds, if not thousands, of gallons of foamy water laced with PFAS to enter the environment in a variety of ways, including but not limited to, through air, soils, sediment, surface water, and groundwater.

38.     AFFF contains PFAS, which are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms. The carbon-fluorine bond is one of the strongest bonds in chemistry and imparts to PFAS their unique chemical properties. The carbon-fluorine bond in PFAS generally does not occur in nature.

39.     The PFAS family, including PFOS and PFOA, has characteristics that cause extensive and long-lasting environmental contamination, giving it the commonly used moniker, "forever chemicals."

40.     PFAS are mobile and persistent in the environment. Once introduced into the environment, PFAS quickly spread because they easily dissolve in water. PFAS also

persist in the environment indefinitely because their multiple carbon-fluorine bonds, which are exceptionally strong and stable, are resistant to metabolic and environmental degradation processes. Similarly, removal of PFAS from drinking water sources requires specialized, and expensive, drinking water treatment systems. In short, once PFAS are used, they migrate through the environment, resist natural degradation, contaminate groundwater and drinking water, and are difficult and costly to remove.

41.     PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are excreted from individual organisms only slowly, ongoing low-level exposure results in a buildup of PFAS within the body. Thus, PFAS also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

42.     PFAS are toxic and cause significant adverse effects to human health. The presence of these chemicals in drinking water presents a serious threat to public health. For example, PFOS exposure is associated with numerous adverse health effects in humans, including increases in serum lipids (i.e., high cholesterol); decreases in antibody response to vaccines; increases in risk of childhood infections; and adverse reproductive and developmental consequences, along with pregnancy-induced hypertension and preeclampsia. PFOA exposure is associated with many of these same adverse health effects but also with decreased birthweight, testicular and kidney cancers, ulcerative colitis, and thyroid disease.

43.     The federal government has recently taken regulatory steps to address the risks presented by PFOS and PFOA. On June 15, 2022, EPA lowered the Health Advisory

16

Limits for PFOA and PFOS. The new interim Health Advisory Limits are 0.004 parts per trillion ("ppt") for PFOA and 0.02 ppt for PFOS. In March 2023, EPA released proposed drinking water standards for PFOS and PFOA, pursuant to the Safe Drinking Water Act. 88 Fed. Reg. 18638 (Mar. 29, 2023). EPA proposed to establish maximum contaminant levels for PFOS and PFOA at 4 ppt, the lowest amount that can be reliably measured today based on available technology.

**B.    Defendants' History Manufacturing and Selling AFFF Products**

44.    For decades, Defendants have advertised, offered for sale, and sold AFFF Products to federal, state, and territory government entities, including the military, counties, municipalities, airports, fire departments, and other governmental or quasi-governmental entities, for use in the State.

45.    3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF. 3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s; 3M is the largest single manufacturer of AFFF.

46.    Other Defendants subsequently began manufacturing AFFF. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s; Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s; and Buckeye began to manufacture, market, and sell AFFF in the 2000s.

47.    Other Defendants manufactured the fluorosurfactants used to make AFFF. Arkema's predecessors supplied fluorosurfactants for AFFF beginning in the 1970s; Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in

17

the 1970s; and Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s.

48.     Still other Defendants acquired the business of supplying fluorosurfactants for AFFF through corporate acquisitions. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it took on the supply of fluorosurfactants used to manufacture AFFF. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it too supplied fluorosurfactants used to manufacture AFFF.  Later, after Chemours' spinoff from Old DuPont, Chemours continued to supply fluorosurfactants used to manufacture AFFF.

49.     At varying times, Defendant Old DuPont more generally supplied the fluorochemicals used to make AFFF.

50.     From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

51.     In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF.  In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention."  In its press release announcing the phase out, 3M stated, "our products are safe" and that 3M's decision was "based on [its] principles of responsible environmental management."  3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk."  3M made no mention in its press releases or regulatory statements of the risks to human health

and the environment posed by the chemicals, although those risks were known to it at the time.

52.      After 3M exited the AFFF market, other Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to obtain a share of the AFFF market when 3M exited, even though Old DuPont had decades of evidence that PFAS were highly toxic and dangerous in the environment.

53.      3M manufactured its AFFF Products through an electrochemical fluorination process that makes it possible to "fingerprint" the PFAS that originated in 3M products.

54.      The remaining Defendants' AFFF Products contain or break down into PFAS, i.e., PFOA, but they were created using a telomerization process, which makes it very difficult to chemically trace the PFOA as being manufactured, distributed, or sold by a particular Defendant. Due to this fungibility, these Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site.

55.      Any inability of the State to identify the original manufacturer of the specific AFFF Products released into the State's natural resources in particular instances at particular sites is a result of the fungibility of the products and not as a result of any action or inaction by the State.

56.      Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Defendants marketed their AFFF Products by promoting their long shelf life. Even after Defendants fully understood the toxicity of PFAS—and their deleterious impacts

19

when released into the environment through the intended use of AFFF Products as Defendants had marketed them to be used—Defendants concealed the true nature of PFAS.

57.    Even while Defendants phased out production or transitioned to other formulas, they did not act to remove their harmful products from the market, advise their customers that they should not use AFFF Products that contained PFAS, or advise their customers that they needed to properly dispose of their stockpiles of AFFF Products or how to do so.  Nor did Defendants warn their customers or the State that the use of AFFF Products would harm the environment, endanger human health, or result in substantial costs to investigate and clean up groundwater contamination and injuries to other natural resources.

58.    Accordingly, for many years after their original sale, AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters of the State, harming the environment and endangering human health.

## 1.    3M Knew, or Should Have Known, of the Harm Caused by PFAS, and 3M Attempted to Suppress Negative Information About These Chemicals.

59.    3M has known for decades that the PFAS contained in its AFFF are toxic and adversely affect the environment and human health.

60.    By 1956, studies showed that 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

61.    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment.  An internal 3M memorandum from 1960 described

3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

62.     As early as 1963, 3M knew that its PFAS products were highly stable in the environment and did not degrade after disposal.

63.     By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life. Around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

64.     By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

65.     In 1975, 3M found there was a "universal presence" of PFAS (PFOA and/or PFOS) in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS—a scenario 3M discussed internally but did not share outside the company. This finding also alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFAS in human blood.

66.     As early as 1976, 3M began monitoring for the presence of PFAS within the blood of its employees because the company was concerned about the health effects of PFAS.

67.     In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with

21

PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

68.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

69.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

70.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

71.     In 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

72.     Despite its understanding of the hazards associated with the PFAS in its products, 3M actively sought to suppress scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

73.     At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

74.     3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. For example, in 1999, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, among other things (i) 3M's tactics to prevent research into the adverse effects of its PFOS, (ii) 3M's submission of misinformation about its PFOS to EPA, (iii) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (iv) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (v) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (vi) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

75.     Dr. Purdy described PFOS as "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

76.     Despite its knowledge of the risks associated with exposures to its PFAS products, when 3M announced it would phase out its PFOS, PFOA, and related products (including AFFF) in 2000, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

23

77. 3M knew, or should have known, that its AFFF, in its intended use, would release PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State due to their toxicity. Such knowledge was accessible to 3M, but not to the State until 3M's acts and omissions came to light and the State developed its own understanding of the toxicity of PFAS.

2. **Old DuPont Knew, or Should Have Known, of the Harms Caused by PFOA, and It Concealed Its Knowledge from Regulators and Users of AFFF Products.**

78. In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical productions applications, including household products like Teflon, and quickly thereafter developed an understanding of the dangers of using these chemicals.

79. During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that the PFAS present in Teflon and its other specialty chemical products would proliferate and contaminate the environment. Old DuPont was further aware that industrial facilities related to products like Teflon emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to its PFAS, including via public and private drinking water supplies.

80. Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such

24

products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

81.     In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

82.     By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State, at that time.

83.     The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

84.     Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

25

85.    Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

86.    In addition to its knowledge of PFOA's toxicity danger, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. Old DuPont was aware, no later than 1984, that PFOA is biopersistent.

87.    Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a 1984 meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

88.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression

26

asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

89.     In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

90.     Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, entered the market for the sale of AFFF after 3M announced its phase out of PFOA and PFOS in 2000 (due to its knowledge of the compounds' toxicity and threats of further enforcement action by EPA).  In 2008, Old DuPont literature was quoted in an Industrial Fire World magazine article regarding AFFF as stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

**3.     Old DuPont Worked in Concert with Other Defendants and the Firefighting Foam Coalition to Protect AFFF Products from Scrutiny.**

91.     The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.  National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours

(collectively, "FFFC Members") were members of the FFFC, as were others in the industry. Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors released from AFFF Products among themselves but did not share that information with the general public or governmental entities, including the State.

92.     FFFC Members worked together to protect AFFF Products from scrutiny, including by coordinating their messaging on PFOA's toxicological profile and on their AFFF Products' contribution of PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities learning the truth about the harms of PFOA to the environment and human health. FFFC Members regularly published newsletters promoting their AFFF Products, while also regularly attending trade group conferences to disseminate misleading messaging.

93.     FFFC Members' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal from the general public and governmental entities, including the State, the risks of their AFFF Products and the PFOA and its precursors contained therein.

94.     FFFC Members repeated the same messaging for years, with the result that only one PFAS chemical—PFOS, which FFFC Members' products did not contain—was taken off the market.

95.　FFFC Members knew, however, that their messaging regarding their AFFF Products was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF Products and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities, including the State.

**4.　The Remaining Defendants Knew, or Should Have Known, of the Harm Caused by the Release of PFOA from Their AFFF Products.**

96.　The remaining Defendants, i.e., all Defendants that are not 3M, Old DuPont, or the FFFC Members, knew, or should have known, that their AFFF Products containing PFAS would harm the environment and human health when used in their common and/or intended use.

97.　The remaining Defendants knew, or should have known, that their AFFF Products released PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State.

98.　The State, by contrast, did not have access to such information and thus was not made aware of the dangers that the Defendants' AFFF Products presented.

**C.　Maryland's Affected Natural Resources**

99.　Maryland law establishes the State's right and obligation to protect its natural resources. As set forth by the statutory sections below, the State is the steward of its environment.

100.    "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the highest public priority." Md. Code Ann., Nat. Res. § 1-302(b).

101.    Pursuant to statute, "[e]ach person has a fundamental and inalienable right to a healthful environment[.]" *Id.* § 1-302(d).

102.    "Because the quality of the waters of this State is vital to the public and private interests of its citizens and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, and the problem of water pollution in this State is closely related to the problem of water pollution in adjoining states, it is State public policy to improve, conserve, and manage the quality of the waters of the State and to protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." Env't § 4-402.

103.    The "quality of the waters of this State is vital to the interests of the citizens of this State[.]" *Id.* § 9-302.   "[B]ecause pollution is a menace to public health and welfare, creates public nuisances, harms . . . and impairs domestic, agricultural . . . and other legitimate beneficial uses of water . . . it is the policy of this State: (1) To improve, conserve, and manage the quality of the waters of this State; (2) To protect, maintain, and improve the quality of water for public supplies . . . and (3) To provide that no waste is

30

discharged into any waters of this State . . . to protect the legitimate beneficial uses of the waters of this State." *Id.*

104.   "The General Assembly determines and finds that lands and waters comprising the watersheds of the State are great natural assets and resources." *Id.* § 4-101.

105.   "It is the policy of the State of Maryland to: . . . (3) Protect the State's natural resources, including the fish and wildlife of the Potomac River, the Chesapeake Bay, and all other waters and waterways of the State." *Id.* § 5-5B-03.

106.   The "waters of the State" include both surface and underground waters within the boundaries of the State or subject to its jurisdiction. *See id.* § 5-101.

107.   "The General Assembly finds that nontidal wetlands play important roles in the preservation and protection of the Chesapeake Bay and other waters of the State." *Id.* § 5-902.

108.   "The General Assembly [also] declares that the Chesapeake Bay and the tidewater portions of its tributaries are a great natural asset and resource to the State and its counties." *Id.* § 5-1101(b).

109.   Under the Maryland Environmental Standing Act, the "General Assembly finds and declares that the natural resources . . . of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment. It further finds that improper use and exploitation constitute an invasion of the *right of every resident of Maryland to an environment free from pollution* to the extent possible. It further finds that the courts of the State of Maryland are an appropriate forum for seeking the protection of the environment and that an unreasonably strict procedural definition of

31

'standing to sue' in environmental matters is not in the public interest." Nat. Res. § 1-502 (emphasis added).

110.   PFOS and PFOA contamination from AFFF Products has injured and continues to injure the waters and property of the State and the property, health, safety, and welfare of Maryland's citizens.

111.   The State owns lands throughout Maryland that it maintains for the benefit of the public, such as parks and wildlife management areas, as well as airports, ports, and firefighting training facilities.

112.   The State holds its waters in trust for the State's citizens and has an obligation to protect public interests in these waters through, among other things, maintaining the environmental quality of its waters.

113.   The State's natural resources include its waters, such as springs, streams, wetlands, groundwater, ocean waters, and estuaries, within its boundaries or otherwise subject to its jurisdiction.

114.   Natural resources and State-owned properties have been injured by past and ongoing contamination caused by PFAS attributable to AFFF Products.

115.   PFAS attributable to AFFF Products have been found in groundwater, surface water, sediments, and soils in the State where AFFF Products were used, stored, disposed of, or otherwise discharged.  Furthermore, the State anticipates that additional contamination of natural resources from PFAS attributable to Defendants' AFFF Products will be uncovered as its investigation continues.

116.   Contamination from PFAS attributable to AFFF Products persists in the

32

State's natural resources, i.e., it does not break down in the environment; damages their intrinsic, i.e., existence and passive use, value; and impairs the public benefits derived from access to, use, and enjoyment of the State's natural resources.

117.    The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely on maintaining a clean environment for their businesses, patrons, and tourists to visit and enjoy.

### 1.    Groundwater

118.    Groundwater is a critical and finite ecological natural resource for the people of the State, as the State relies on groundwater for drinking, irrigation, and agriculture.

119.    Maryland relies on groundwater for drinking water supplies. Groundwater is the most commonly used source of water supply, and some regions of the State (Southern Maryland and the Eastern Shore) rely exclusively on groundwater for their water needs. That is, nearly 3,153 of the State's 3,242 public water systems rely exclusively on groundwater. Approximately one-third of Marylanders rely on groundwater as their source of drinking water.

120.    In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems. Groundwater also keeps water in rivers during times of drought.

121.    Groundwater promotes the movement of water and nutrients within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides groundwater stabilization, and helps to maintain critical water levels in freshwater wetlands.

122.    Groundwater and the State's other natural resources are unique resources that help sustain the State's economy.

123.    AFFF Products are a significant source of PFAS contamination in groundwater; they mobilize in and through groundwater sources to reach areas beyond the location of the AFFF Products' use. This contamination adversely affects the groundwater.

124.    Investigations in the State have revealed elevated levels of PFAS in the groundwater and specifically in potable groundwater.

125.    Investigation of contamination from AFFF Products in groundwater in the State is ongoing.

**2.    Surface Water**

126.    Surface water is a critical ecological resource of the State. Approximately 10% of the Community Water Systems (around 50 systems) in Maryland rely on surface water, yet these surface water systems serve about 80% of the population *using public water systems*.

127.    Surface water in the State is also used for recreational, industrial, agricultural, and other commercial purposes. Specific uses include swimming, boating, recreational fishing and crabbing, commercial fishing and crabbing, and oyster farming.

128.    Surface water additionally provides aesthetic and ecological values, including supporting aquatic ecosystems, nearby communities, and the residents of the State.

129.    PFAS are mobile and persistent in surface water and can spread great distances from the point of discharge.  PFAS contamination attributable to the use of AFFF Products in the State has reached and adversely affected surface water throughout the State.

130.    Investigation of contamination from AFFF Products in surface water in the State is ongoing.

### 3.    Coastal Resources and Estuaries

131.    Maryland has more than 3,000 miles of shoreline, most of which is along Chesapeake Bay and its tidal tributaries and the Atlantic Ocean.

132.    Chesapeake Bay is the largest estuary in the United States.

133.    Estuaries are partially enclosed bodies of water surrounding coastal habitats where saltwater from the ocean mixes with fresh water from rivers and streams within the State.

134.    Estuaries provide habitat for many kinds of marine life and commercially important species including striped bass, blue crabs, and oysters.

135.    Use of AFFF Products at locations in the State have resulted in PFAS contamination of the State's estuaries and surrounding lands.  These coastal habitats and estuaries are some of the most imperiled marine habitats due to the contamination caused by AFFF Products and they serve as long-term reservoirs of PFAS, where PFAS are stored

35

and released over time, impacting the estuaries and increasing PFAS concentrations in the cells and tissues of the shellfish and other wildlife that people consume.

136.    The State is continuing its investigation of AFFF Products-related PFAS contamination in the coastal areas, estuaries, and surrounding lands in the State.

### 4.    Sediments, Soils, and Submerged Land

137.    The State's sediments, soils, and submerged lands are critical components of the State's ecological resources. Sediments, soils, and submerged lands sustain a wide diversity of plants and animals that are essential to a healthy ecosystem.  They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

138.    PFAS contamination attributable to the use of AFFF Products in the State has reached and adversely affected soil and sediment throughout the State. Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the State. PFAS in sediments, as well as in surface water, support the potential increase of PFAS concentrations in fish.

139.    Investigation of contamination from AFFF Products in sediments, soils, and submerged lands in the State is ongoing.

### 5.    Biota

140.    Biota, including the State's flora and fauna, are critical ecological resources.

141.    Contamination attributable to PFAS from AFFF Products poses a risk to plants and animals because PFAS can cause damage to the liver and immune system in animals and has been shown to damage cell structure and organelle functions in plants.

142. Natural resource injuries to biota in the State negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

143. Moreover, impacts to fish within the State likely due to AFFF Products have been documented. For example, on October 26, 2020, MDE collected Sunfish and Yellow Bullhead Catfish samples from locations in Piscataway Creek in Prince George's County because Joint Base Andrews, which is located adjacent to the upper reaches of the creek, is a known source of AFFF, and an area near the mouth of Piscataway Creek is popular for recreational fishing. The results from the fish tissue collection showed elevated levels of PFOS in Sunfish collected west of Route 210 in the nontidal portion of the creek.

144. Because this warranted further investigation, fish tissue and water samples were collected from the area in 2021 to, among other things, validate the 2020 measurements in Sunfish. MDE found elevated concentrations of PFOS in non-tidal Redbreast Sunfish, Yellow Bullhead Catfish, and tidal Largemouth Bass, leading to Maryland's first fish consumption advisory based on PFAS.

145. The MDE Piscataway Fish Consumption Advisory for PFOS states that "adults and children should consume no more than 1 meal per month of Redbreast Sunfish from the affected area. MDE also recommends consumption of no more than 7 meals per month (for children only) of Yellow Bullhead Catfish. Finally, MDE recommends that adults should limit their consumption of Largemouth Bass to 3 meals per month, and children should be limited to 2 meals per month."

146.    The advisories concerning Redbreast Sunfish and Largemouth Bass represent two of the five "avoid" advisories for PFOS, and they are the only two such advisories issued for the general population. The other "avoid" advisories were issued only for children under six.

147.    PFAS contamination attributable to Defendants' AFFF Products has reached and adversely affected biota in the State, such as fish and osprey that live in and depend on water bodies contaminated with PFAS from AFFF Products.

148.    Investigation of AFFF Products-related contamination in biota in the State is ongoing.

**D.      AFFF Products Have Resulted in PFAS Contamination in the State, Including Sources of Drinking Water, and Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources.**

149.    The State's natural resources have been contaminated with PFAS through the use of AFFF Products, and investigation of that contamination is ongoing. Defendants' manufacturing, marketing, and selling of AFFF Products in the State, including to the U.S. military, have been a substantial factor in causing PFAS contamination and injuries to the natural resources of the State. As investigation continues, additional locations are identified, and on- and offsite AFFF Products-related contamination is delineated, it is expected that significant further PFAS contamination from AFFF Products will be discovered.

150.    Investigation thus far has revealed contamination at military bases including: the Naval Research Lab, Chesapeake Bay Detachment; Joint Base Andrews; Fort Meade; former Fort Meade Tipton Airfield; Webster Field Annex of Naval Air Station Patuxent

38

River; Maryland Air National Guard at Martin State Airport; the former Navy Bayhead Annex in Annapolis; the former Naval Research Lab in White Oak; Aberdeen Proving Ground; Naval Air Station Patuxent River; and the former Brandywine Defense Reutilization and Marketing Office.

151.   At Naval Research Lab, Chesapeake Bay Detachment, for example, the Navy reportedly tested the use of AFFF at the site beginning in 1968.   In 2017, the Navy conducted a site investigation and discovered a large PFAS plume in the shallow aquifer. Groundwater sampling results found up to 234,000 ppt of PFOS.  PFAS have been detected in private drinking water wells offsite.

152.   At Joint Base Andrews, a site investigation found surface soil of up to 17,000,000 ppt PFOS and up to 150,000 ppt PFOA; subsurface soil up to 21,000 ppt PFOS and up to 5,900 ppt PFOA; groundwater of up to 38,400 ppt PFOS and PFOA combined; surface water up to 8,510 ppt PFOS and PFOA combined; and sediment up to 27,000 ppt PFOS and up to 610 ppt PFOA. As alleged above in ¶¶ 143-46, testing in Piscataway Creek revealed PFAS contamination, and a fish consumption advisory was issued.

153.   As investigation of AFFF Products-related contamination continues at military bases, at other types of sites, and in impacted natural resources, further contamination is anticipated to be found. This investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the affected natural resources to levels that are safe for human health and the environment and to the condition they were in prior to the impact of these contaminants.

154.   Each Defendant has caused PFAS contamination in the State through the manufacture, marketing, and sale of AFFF Products.

155.   Each Defendant's AFFF Products are a substantial factor in causing the injury inflicted on the State's natural resources.

156.   Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with PFAS from AFFF Products, as well as for the State's loss of past, present, and future uses of such contaminated natural resources.

157.   PFAS contamination in groundwater and surface water is likewise affecting the State's drinking water sources. Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water adversely affected by PFAS from AFFF Products in the State.

**E.     The Regulation of AFFF Within the State of Maryland**

158.   Maryland began regulating AFFF in 2020, with the enactment of Chapter 276 of the General Assembly's legislative session that year.

159.   Under current Maryland law, and with certain limited exceptions, i.e., at airports, ports, refineries, chemical plants, terminals, and when AFFF is required to be used by federal law, "on or after January 1, 2024, a person may not use, manufacture, or knowingly sell, offer for sale, or distribute for sale or use Class B fire-fighting foam that contains intentionally added PFAS chemicals in the State." Env't § 6-1603(a).

160.   Under § 6-1603(c) of the Environment Article, "(1) A person that is authorized . . . to use Class B fire-fighting foam that contains intentionally added PFAS

40

chemicals: (i) May not release the foam directly into the environment, including through unsealed ground, soakage pits, waterways, or uncontrolled drains; and (ii) Shall: 1. Fully contain all releases on site; 2. Implement containment measures, including bunds and ponds, that are controlled and impervious to PFAS chemicals and do not allow firewater, wastewater, runoff, and other wastes to be released into the environment, including soils, groundwater, waterways, and stormwater; 3. Dispose of all firewater, wastewater, runoff, and other wastes in a way that prevents releases into the environment; 4. Within 5 days after a release in violation of item (i) of this paragraph, report the release to the Department [of the Environment], including information on the identity of the foam, the quantity used, the total PFAS concentration, and the form of any waste that contains PFAS chemicals; and 5. Maintain documentation on any measures taken under this paragraph." *Id.* § 6-1603(c).

161.    Moreover, "(1) On request of a fire department in the State, the Department shall take back from the fire department Class B fire-fighting foam that contains intentionally added PFAS chemicals. (2) The Department shall dispose of fire-fighting foam received under this subsection in a manner consistent with this subtitle. (3) For fiscal year 2024, the Governor shall include in the annual budget bill an appropriation of $500,000 to the Department for the purpose of taking back and disposing of fire-fighting foam under this section." *Id.* § 6-1603(e).

162.    Finally, "[a] person may not dispose of a Class B fire-fighting foam that contains intentionally added PFAS chemicals: (1) Using incineration, including by burning, combustion, pyrolysis, gasification, thermal oxidation, acid recovery furnace or

41

oxidizer, ore roaster, cement kiln, lightweight aggregate kiln, industrial furnace boiler, and process heater; or (2) In a landfill." *Id.* § 6-1604.

**F.     Old DuPont's Multi-Step, Years-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors**

163.    As EPA, states, and private plaintiffs became aware of the hazards presented by the presence of PFAS in AFFF, Old DuPont, beginning in or about 2013 and continuing through at least June 2019, planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities, especially those arising from PFOA and other PFAS contamination.

164.    Old DuPont's potential cumulative liability related to PFOA and other PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

165.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to PFOA, including through public and private drinking water supplies, like those in Maryland, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known,

42

that it faced billions of dollars in liabilities arising from its use of PFAS, including PFAS-containing AFFF.

166.    Beginning, at least, in 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

167.    Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

168.    In 2005, after settling the Tennant case, Old DuPont settled claims brought by EPA for violations of TSCA and RCRA related to its failure to disclose toxicity and exposure information for PFOA, as discussed in ¶ 89.

169.    Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and

West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

170.    Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

171.    By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

172.    After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio (the "Ohio MDL").  Forty bellwether trials were scheduled to take place in 2015 and 2016.

173.    The first three trials in the Ohio MDL ended in plaintiffs' verdicts. Each jury awarded damages in a larger amount than the one before it: the first awarded $1.6 million; the second awarded $5.6 million; and the third awarded $12.5 million.   The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million dollars.

174.    Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, its releases and disposal of PFAS chemicals globally, and for toxic PFAS chemicals in its own products and the myriad products into which its toxic PFAS were incorporated, and that its liability likely measured in the billions of dollars.

175.    Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

176.    In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

177.    However, neither Old Dow nor any other rational merger partner would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

178.    Accordingly, Old DuPont's management decided to pursue a multi-year corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

179.    Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company, (ii) the creation of New DuPont to facilitate a purported merger with Old Dow, and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

180.    The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business"), into its wholly owned subsidiary, Chemours.  And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

181.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume.  Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

182.    The second step in the scheme involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont,

Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

183.    In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which culminated in DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc., i.e., New DuPont.

184.    Old DuPont's restructuring, beginning with the spinoff of Chemours in 2015, and ending with the spinoff of Corteva on June 1, 2019, was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

185.    As a result of this restructuring, between December 2014, i.e., before the Chemours Spinoff, and December 2019, i.e., after the Dow merger, the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

186.    New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

187.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva, likely intentionally, have acted to hide from creditors the details about where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

188.   The below graphic depicts the restructuring as it progressed through each of the three steps:



189.   In greater detail, the restructuring scheme was implemented as follows:

**1.     Step 1: The Chemours Spinoff**

190.   In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

191.   On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

192.   On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

193.   At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments,

including business units that had manufactured, used, and discharged PFOA into the environment.

194.     Prior to the spinoff, Chemours's Board of Directors was dominated by Old DuPont employees.  As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

195.     To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015, Separation Agreement (the "Chemours Separation Agreement").

196.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

197.     At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

198.     Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

199.     Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Old DuPont required Chemours to fund these distributions through financing

transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion, entered into on May 12, 2015. Also, Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

200. Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

201. In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

202. Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

50

203. Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

204. The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

205. In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

206. There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

207. The Chemours Spinoff was so one-sided that Chemours, in May 2019, sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

208. In its Amended Complaint, which was verified by Chemours's current Chief Executive Officer, Mark Newman, Chemours alleged that the primary motivation for the

51

Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

209.   Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

210.   Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff.  Indeed, during the period in which the terms of the commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

211.   Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as PFAS-containing AFFF, and in so doing, shield Old DuPont.

212.   Given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont.  Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that

its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

213.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

214.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion.  At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

215.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.  Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

216.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

217.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant.  Per the amendment, Chemours paid $320.35 million

to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

218.   Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

### 2.      Step 2: The Old Dow/Old DuPont "Merger"

219.   After the Chemours Spinoff, Old DuPont took the position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

220.   Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, however, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

221.   Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

222.   On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to separate the combined companies'

54

businesses into three publicly traded companies through further spinoffs, each of which would occur 18-to-24 months following the closing of the merger.

223.   To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., i.e., New DuPont, and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

224.   Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

225.   Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.  DowDuPont was aware of Old DuPont's historical PFAS liabilities.

226.   The corporate organization following the "merger" is depicted under "Step 2" in the graphic depicted in ¶ 188.

**3.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

227.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures."  The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

228.    The transactions were intended further to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

229.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

230.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it appears that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

231.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly

formed business lines: (i) Corteva, which became the parent holding company of Old

DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became

the parent holding company of Old Dow, and which holds the Materials Science Business.

DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and

New Dow into separate, publicly traded companies.

232.    The below graphic depicts the structure of DowDuPont after the internal

reorganization and realignment (and notes the planned disposition of the new companies):



233.    The mechanics of the separations are governed by the April 1, 2019,

Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the

"DowDuPont Separation Agreement").

234.    The DowDuPont Separation Agreement generally allocates the assets

primarily related to the respective business divisions to Corteva (Agriculture Business),

New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

235.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained.  In particular, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

236.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including its PFAS liabilities.  These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

237.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

238.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses.  The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the State's natural resources.

239.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

240.    DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

241.    On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

242.    Corteva now holds 100% of the outstanding common stock of Old DuPont.

243.    The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic in ¶ 188.

244.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc., i.e., New DuPont.

245.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**G.    The Effect of the Years-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

246.    The net result of these transactions, including the June 1, 2019, Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

247. Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

248. In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

249. For example, for the fiscal year ending 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

250. Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (also known as Earnings Before Tax or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

251. Also, for the fiscal year ending in 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ending in 2019, Old DuPont owned just under $21 billion in tangible assets.

252.   That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets, totaling $20 billion.

253.   As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

254.   At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

255.   In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is unclear whether either entity will be able to satisfy future judgments.

256.   Indeed, New DuPont, to which PFAS liabilities are allocated under the DowDuPont Separation Agreement, has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value and is in the process of divesting more.

257.   Old DuPont's parent holding company, Corteva, to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied, holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

61

258.   The Chemours Spinoff, the Dow-DuPont Merger, and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors.   The Chemours Spinoff constitutes a fraudulent transfer, which entitles the State, among other things, to void the transaction and recover property or value transferred from Chemours in the transaction.   The Dow-DuPont Merger and separation of Corteva from New DuPont likewise constitutes a fraudulent transfer that entitles the State, among other things, to recover property and value transferred to New DuPont and Corteva.

**COUNT I**
**STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN**

259.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

260.   Defendants designed, manufactured, marketed, and sold AFFF Products containing PFOS, PFOA, and/or their precursors that were transported, stored, used, handled, released, spilled, and/or disposed of in Maryland during the relevant period.

261.   As designers, manufacturers, marketers, and sellers of AFFF Products, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.   Defendants owed that duty both to reasonably foreseeable users of their products and also to any person or property that might reasonably be expected to come into contact with those products.

262.   Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors were used in a reasonably foreseeable manner and without substantial change in the condition of such products. These products were defective and unfit for their

62

reasonable use at the time they left Defendants' possession or control. Defendants' AFFF Products foreseeably contaminated groundwater, surface water, sediments, soils, biota, and other natural resources at and around the sites where they were used.

263.   Defendants knew, or reasonably should have known, that their manufacture, marketing, and/or sale, as well as their customers' transport, storage, use, handling, release, spilling, and/or disposal of AFFF Products in an intended or reasonably foreseeable manner would result in the release of PFOS and PFOA into the environment, including at various locations in Maryland.

264.   AFFF Products containing PFOS, PFOA, and/or their precursors used at various sites in Maryland have injured and are continuing to injure groundwater, surface water, sediments, soils, biota, and other natural resources at and/or around these sites. Defendants' AFFF Products were defective in design and unreasonably dangerous because, among other things:

a.     Defendants' AFFF Products cause extensive and persistent PFOS and PFOA contamination when used in a reasonably foreseeable and intended manner;

b.     PFOS and PFOA released into the environment from Defendants' AFFF Products cause contamination in groundwater and surface water that are the sources of drinking water and pose significant threats to public health and welfare; and

c.     Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOS and PFOA.

265.   At all times relevant to this action, the AFFF Products that Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

266.   At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Defendants' AFFF Products containing PFOS, PFOA, and/or their precursors outweighed the cost to Defendants of reducing or eliminating such risk.

267.   At all times relevant to this action, Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products, and the omission of such alternative designs rendered their AFFF Products not reasonably safe.   While Defendants have recently transitioned to short-chain PFAS-based AFFF Products, which they claim are safer, they could have made this transition earlier.   Moreover, AFFF Products can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

268.   As a direct and proximate result of the defects in Defendants' design, manufacture, marketing, and sale of AFFF Products containing PFOS, PFOA, and/or their precursors, groundwater, surface water, sediments, soils, biota, and other natural resources at and/or near the various sites throughout Maryland where the AFFF Products were used have become contaminated with PFOS and/or PFOA, causing the State and its citizens significant injury and damage.

269.   As a direct and proximate result of Defendants' acts and omissions, as alleged herein, the State has incurred, is incurring, and will continue to incur damages in

an amount to be proved at trial related to PFOS and PFOA contamination of groundwater, surface water, sediment, soils, biota, and other natural resources at and/or near the various sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed.

270.   As a further direct and proximate result of Defendants' acts and omissions, the State has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface water, sediments, soils, biota, and other natural resources at and/or near the various sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed, for which Defendants are strictly liable.

271.   Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein.

272.   The AFFF Products were in a defective condition when they left Defendants' possession or control.

273.   The State and its citizens did not voluntarily expose themselves to the risks posed by AFFF Products while realizing the dangers.

274.   The State and its citizens did not unreasonably or knowingly expose themselves to the risk posed by AFFF Products.

275.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

65

276.    Defendants are strictly liable for all such damages, and the State is entitled to recover all such damages and other relief as set forth below.

277.    New DuPont and Corteva assumed Old DuPont's design defect liability described above.

## COUNT II
## STRICT PRODUCTS LIABILITY –FAILURE TO WARN

278.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

279.    As designers, manufacturers, marketers, and sellers of AFFF Products containing PFOS, PFOA, and/or their precursors, Defendants had a strict duty to the State and to those who were foreseeably at risk of being harmed by AFFF Products to warn users of those products and the State of the foreseeable harms associated with them.

280.    Defendants had a duty to warn the State about the dangers of their AFFF Products because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; the State is charged with enforcing the State's environmental laws and regulations; the State maintains sovereign and "quasi-sovereign" interests in the wellbeing of its residents; and the State has proprietary interests in lands that it owns.

281.    Defendants inadequately warned of the likelihood that PFOS and/or PFOA would be released into the environment during the normal use of Defendants' AFFF Products and of the widespread, toxic, and persistent effects of such releases. Defendants failed to provide such warnings to (i) users and buyers of their AFFF Products containing

66

PFOS, PFOA, and/or their precursors; (ii) the State; and (iii) others to which it was reasonably foreseeable Defendants' AFFF Products would cause harm.

282.   To the extent Defendants provided any warnings about their products, those were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by AFFF Products containing PFOS, PFOA, and/or their precursors. Any such warnings were not clear and they did not convey sufficient information about the dangers of AFFF Products containing these chemicals to alert an ordinary or reasonably foreseeable user or bystander.

283.   Despite the fact that Defendants knew or should have known about the risks of AFFF Products containing PFOS, PFOA, and/or their precursors, Defendants withheld such knowledge from the State, regulators, and the public. Moreover, Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

284.   At no time relevant to this action did Defendants warn users and buyers of their AFFF Products, the State, and others whom Defendants should have reasonably foreseen would use their AFFF Products or be harmed by them, that Defendants' AFFF Products would release PFOS and/or PFOA into the environment during the AFFF Products' normal use. Defendants further failed to warn these entities and individuals of the widespread, toxic, and persistent effects of such releases.

285.   Defendants' AFFF Products were in the same condition when they were purchased and/or used as they were when they left Defendants' control. Defendants'

customers used the AFFF Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

286.   Had Defendants provided adequate warnings about the hazards associated with their AFFF Products, the users and buyers of the products, the State, and others who would reasonably foreseeably transport, store, use, release, dispose, and/or otherwise handle or be harmed by the AFFF Products would have heeded those warnings.

287.   As a direct and proximate result of Defendants' failure to warn of the hazards of AFFF Products containing PFOS, PFOA, and/or their precursors, the groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed have become contaminated with PFOS and PFOA.

288.   As a direct and proximate result of Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur in the future damages related to PFOS and PFOA contamination from AFFF Products in an amount to be proven at trial.

289.   Defendants knew it was substantially certain that their acts and omissions described above would cause the State's injury and damage.

290.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

291.   Defendants are strictly liable for all such damages, and the State is entitled to recover all such damages and other relief as set forth below.

292.     New DuPont and Corteva assumed Old DuPont's failure to warn liability described above.

## COUNT III
## PUBLIC NUISANCE

293.     The State incorporates by reference the preceding paragraphs as though fully set forth herein.

294.     Groundwater, surface water, sediments, soils, and biota are natural resources of the State held in trust by the State for the benefit of the public.

295.     The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

296.     The contamination of the groundwater, surface water, sediment, soils, and biota at and around the various sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed constitutes a physical invasion of the State's natural resources and, on information and belief, the State's real property in the vicinity of these sites and an unreasonable and substantial interference, both actual and potential, with (i) the exercise of the public's common right to these natural resources; (ii) the State's special property and statutory status and obligations regarding the natural resources of the State; (iii) the State's ability to protect, conserve, and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (iv) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

69

297.    As long as the natural resources at and around these various sites throughout Maryland remain contaminated by PFAS from Defendants' AFFF Products, which are present due to Defendants' conduct, the public nuisance continues.

298.    Until these natural resources are restored to their pre-injury quality, Defendants are liable for the creation and continued presence of a public nuisance in contravention of the public's common right to clean natural resources.

299.    The discharge of PFOS and PFOA from AFFF Products into drinking water constitutes a public nuisance, including because such discharges create a "condition that is dangerous to health and safety" including a "contaminated water supply" and an "inadequately protected water supply." Md. Code Ann., Health-Gen. § 20-301(a).

300.    Defendants marketed AFFF Products to their customers, including Maryland governmental entities, knowing that the use of their AFFF Products, utilized exactly as marketed for their intended use, would create a public nuisance. Likewise, well after Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFOS and PFOA in the environment, Defendants never instructed their customers, including governmental entities in Maryland, to stop using the AFFF Products in their possession or that they needed to specially dispose of AFFF Products so as to not further contaminate the natural resources of the State.

301.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

70

302.   New DuPont and Corteva assumed Old DuPont's nuisance liability described above.

## COUNT IV
## TRESPASS

303.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

304.   Defendants' intentional and/or negligent conduct caused AFFF Products containing PFOA, PFOS, and/or their precursors, to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon the State's possessory interest in properties it owns, including but not limited to State lands, parks, wildlife management areas, tidal bodies of water, and certain lakes.

305.   AFFF Products containing PFOA, PFOS, and/or their precursors, manufactured and/or supplied by Defendants continue to be located on or in the State's property.

306.   Defendants intended to manufacture AFFF Products containing PFOA, PFOS, and/or their precursors, and knew with substantial certainty that their acts would contaminate the State's property.

307.   Defendants are therefore liable for trespass and continued trespass.

308.   Defendants did not and do not have authority, privilege, or permission to trespass upon the aforesaid possessory property interests.

309.   The State has never consented to the trespasses alleged herein.

310.   Defendants have refused and failed to terminate their trespasses, despite being put on notice to do so by the State through its policies, statutes, regulations, orders, and other means.

311.   Defendants' trespass is of a continuing nature and has produced a long-lasting negative effect upon the property of the State, as Defendants knew or had reason to know at all times relevant hereto.

312.   Based on their conduct, Defendants have, at all times relevant to this action, created, caused, maintained, continued, substantially contributed to, substantially participated in, and/or assisted in the creation of such trespass. Based on their knowledge of the properties and manner of distribution and storage of AFFF Products containing PFOA, PFOS, and/or their precursors, as alleged herein, Defendants were or should have been aware that as a result of their conduct, contamination of the State's property was inevitable or substantially certain to result.

313.   As a direct and proximate cause of Defendants' conduct, the State has suffered and continued to suffer damages from Defendants' conduct and the presence of AFFF Products containing PFOA, PFOS, and/or their precursors, in the State's property, including without limitation costs to assess, investigate, monitor, analyze and remediate contamination, costs to prevent AFFF Products from injuring additional property of the State, and costs to restore and replace the State's impacted natural resources whose use has been lost or degraded.

72

314.    As a direct and proximate result of Defendants' acts and omissions, the State has incurred and suffered, and will continue to incur and suffer, substantial costs and damages for which Defendants are liable.

315.    New DuPont and Corteva assumed Old DuPont's trespass liability described above.

### COUNT V
### NEGLIGENCE

316.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

317.    Defendants had a duty to the State to ensure that PFOS and/or PFOA were not released as a result of the transport, storage, use, handling, release, spilling, and/or disposal of their AFFF Products and did not injure groundwater, surface water, sediment, soils, and biota in Maryland.

318.    Defendants had a duty to the State to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of their AFFF Products containing PFOS, PFOA, and/or their precursors.

319.    Defendants breached these duties, by among other things, failing to conform to the requisite standard of care.

320.    Groundwater, surface water, sediments, soils, biota, and other natural resources at and around various sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed of have become contaminated with PFOS and PFOA as a direct and proximate result of

73

Defendants' negligence in designing AFFF Products and in failing to warn AFFF Products purchasers, the State, and others whom Defendants should have reasonably foreseen would transport, store, use, handle, release, spill, and/or dispose, or be harmed by the AFFF Products.

321.   As a direct and proximate result of the contamination of the environment from Defendants' AFFF Products containing PFOA, PFOS, and/or their precursors, the State has incurred, is incurring, and will continue to incur investigation, clean up and removal, treatment, monitoring, and restoration costs and expenses for which Defendants are liable.

322.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

323.   New DuPont and Corteva assumed Old DuPont's negligence liability described above.

## COUNT VI
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 3 CLAIM

324.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

325.   The Secretary of MDE "[h]as supervision and control over the sanitary and physical condition of the waters of this State to protect public health and comfort[.]" Env't § 9-252(b).

326.   Pursuant to § 9-322 of the Environment Article, "a person may not discharge any pollutant into the waters of this State" without a permit.

327.   "'Discharge' means: (1) The addition, introduction, leaking, spilling, or emitting of a pollutant into the waters of this State; or (2) The placing of a pollutant in a location where the pollutant is likely to pollute." *Id.* § 9-101(b).

328.   "Pollutant" includes "[a]ny . . . liquid, gaseous, solid, or other substance that will pollute any waters of this State." *Id.* § 9-101(g). "'Pollution' means any contamination or other alteration of the physical, chemical, or biological properties of any waters of this State, including a change in . . . taste, color, turbidity, or odor of the waters or the discharge or deposit of any . . . liquid . . . or other substance into any waters of this State that will render the waters harmful or detrimental to: (1) Public health, safety, or welfare; (2) Domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses; (3) Livestock, wild animals, or birds; or (4) Fish or other aquatic life." *Id.* § 9-101(h).

329.   The "Department may bring an action for an injunction against any person who violates any provision of [Subtitle 3] or any rule, regulation, order, or permit adopted or issued by the Department under [Subtitle 3]." *Id.* § 9-339(a). The "court shall grant an injunction without requiring a showing of a lack of an adequate remedy at law." *Id.* § 9-339(c).

330.   Defendants are responsible for discharges of AFFF Products containing PFOA, PFOS, and/or their precursors, into the waters of the State. Each Defendant's acts and/or omissions caused one or more discharges of AFFF Products into the waters of the State. As Defendants violated and continue to violate Title 9, Subtitle 3 by discharging

75

AFFF products throughout the State, the Department is empowered to seek an injunction ordering Defendants to investigate and fully delineate horizontally and vertically the full extent of all contamination for which the Defendants are responsible and to ensure the cleanup of such contamination so that the waters of the State are in the same state they were in prior to the discharges. *Id.* § 9-339(c); 9-302(b)(1) ("To improve, conserve, and manage the quality of the waters of this State"); 9-302(b)(2) ("To protect, maintain, and improve the quality of the water….").

331.    Because Defendants discharged AFFF Products containing PFOA, PFOS, and/or their precursors, into the waters of this State, they "shall reimburse the Department for the reasonable costs incurred by the Department in conducting environmental health monitoring or testing, including the costs of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect on public health and the environment of the [Defendants'] discharge[s]." *Id.* § 9-342.2; *see* COMAR 26.14.01.04.

332.    New DuPont and Corteva assumed Old DuPont's liability described above.

## COUNT VII
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 4 CLAIM

333.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

334.    AFFF Products containing PFOA, PFOS, and/or their precursors, are "dangerous contaminant[s]" because when they are "present in a public water system, they present an imminent and substantial danger to the health of individuals." Env't § 9-405(a).

335. Upon receipt of information that AFFF Products "[are] present in or likely to enter a public water system," the Secretary of the Maryland Department of Environment "may take any action necessary to protect the health of the individuals whose health is or would be endangered" by the AFFF Products. *Id.* § 9-405(b)(1). The actions the Secretary may take include suing "for injunctive or other appropriate relief." *Id.* § 9-405(b)(2)(ii).

336. In order to stop AFFF Products containing PFOA, PFOS, and/or their precursors, from entering public water systems, the Secretary may seek an injunction that orders Defendants to investigate and fully delineate horizontally and vertically the full extent of all contamination for which the Defendants are responsible and to ensure the cleanup so that the groundwater is in the same state it was in prior to the discharges.

337. New DuPont and Corteva assumed Old DuPont's liability described above.

## COUNT VIII
## ACTUAL FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF
### (Old DuPont, Chemours, New DuPont, and Corteva Only)

338. The State incorporates the preceding paragraphs as though fully set forth herein.

339. The State seeks equitable and other relief against Old DuPont and Chemours under §§ 15-201 to -214 of the Commercial Law Article and Delaware Code title 6, §§ 1301 to 1312.

340. Under Commercial Law § 15-207 and Delaware Code title 6 § 1304(a)(1), a transaction made by a debtor "with actual intent ... to hinder, delay, or defraud any present or future creditor" is voidable as to the creditor's claim.

77

341.    Under Commercial Law § 15-201 and Delaware Code title 6 §§ 1301(3), (4),
a "creditor" is "a person who has any claim, whether matured or unmatured, liquidated or
unliquidated, absolute, fixed, or contingent."

342.    The State is and was a creditor of Chemours at all relevant times.

343.    Through its participation in the Chemours Spinoff, as detailed above,
Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the
"Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to
the Separation Agreement (the "Chemours Assumed Liabilities").

344.    The Chemours Transfers and Chemours Assumed Liabilities were made for
the benefit of Old DuPont.

345.    At the time that the Chemours Transfers were made and the Chemours
Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old
DuPont was in a position to, and in fact did, control and dominate Chemours.

346.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and
defraud creditors or future creditors such as the State.

347.    The State has been harmed as a result of the Chemours Transfers.

348.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to
transfer its assets out of the reach of parties such as the State that have been damaged as a
result of the actions described in this Complaint.

349.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6,
§§ 1301 to 1312, the State seeks to void the Chemours Transfers and to recover property
or value that Chemours transferred to Old DuPont.

350.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

351.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

352.    The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

### COUNT IX
### CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF
### (Old DuPont, Chemours, New DuPont, and Corteva Only)

353.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

354.    The State seeks equitable and other relief pursuant Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 against Old DuPont and Chemours.

355.    Under Commercial Law §§ 15-204, 15-205, 15-206 and Delaware Code title 6, §§ 1304(a)(2), 1305(a), a transaction made by a debtor "without a fair consideration" is voidable if the debtor (i) "is engaged or is about to engage in a business or a transaction for which the property remaining in his hands after the conveyance is an unreasonably small

79

capital"; (ii) "intends or believes that he will incur debts beyond his ability to pay as they mature"; or (iii) "is rendered insolvent by" the transaction.

356.   Chemours did not receive a fair or reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

357.   Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

358.   At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

359.   Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

360.   Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

361.   At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

362.   The State has been harmed as a result of the Chemours Transfers.

363.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

364.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

365.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

366.    The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

**COUNT X**
**ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA**
**(Old DuPont, New DuPont, and Corteva Only)**

367.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

368.    The State seeks equitable and other relief pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, against Old DuPont, New DuPont, and Corteva.

369.    The State is and was a creditor of Old DuPont at all relevant times.

370.    Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the

Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

371.   The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

372.   At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

373.   Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay and defraud creditors or future creditors such as the State.

374.   The State has been harmed as a result of the Old DuPont Transfers.

375.   Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that has been damaged as a result of the actions described in this Complaint.

376.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

377.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from

the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seek a constructive trust over such proceeds for the benefit of the State.

378.   The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

## COUNT XI
## CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA
### (Old DuPont, New DuPont, and Corteva Only)

379.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

380.   The State seeks equitable and other relief pursuant to the Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 against Old DuPont, New DuPont, and Corteva.

381.   Old DuPont did not receive a fair or reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

382.   Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

383.   At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

384.   Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

385.   Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

386.   At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

387.   The State has been harmed as a result of the Old DuPont Transfers.

388.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

389.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the State.

390.   The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** the State requests that this Court enter judgment against Defendants as follows:

a.      Finding Defendants liable for all costs, in an amount that exceeds $75,000.00, (i) to collect, return, and dispose of existing stocks of Defendants' AFFF Products; (ii) to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFOS and PFOA contamination at and around the sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition;

b.      Finding Defendants liable for all damages, in an amount that exceeds $75,000.00, to compensate the citizens of Maryland for the lost use and value of its natural resources during all times of injury caused by AFFF Products, and for such orders as may be necessary to provide full relief to address risks to the State, including, but not limited to, the costs of:

      i.      Past and future testing of natural resources at and around the sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed and, thus, likely caused PFOS and/or PFOA contamination;

      ii.      Past and future treatment of all natural resources at and around the sites throughout Maryland where Defendants' AFFF Products were transported,

stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFOS and/or PFOA until restored to non-detectable levels; and

      iii.      Past and future monitoring of the State's natural resources at and around the sites throughout Maryland where Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFOS and/or PFOA, and restoration of such natural resources to their pre-discharge condition;

      c.      Ordering Defendants to pay for all costs, in an amount that exceeds $75,000.00, related to the investigation, cleanup, restoration, treatment, and monitoring of PFOS and/or PFOA contamination of the State's natural resources attributable to Defendants' AFFF Products;

      d.      Ordering Defendants to pay all damages to the State in an amount that exceeds $75,000.00 and at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFOS and/or PFOA contamination attributable to Defendants' AFFF Products;

      e.      Ordering Defendants to pay all compensatory damages, in an amount that exceeds $75,000.00, for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFOS and/or PFOA contamination attributable to Defendants' AFFF Products of such natural resources;

      f.      Ordering Defendants to pay all other damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of

Defendants' acts and omissions alleged herein with respect to AFFF Products, in an amount that exceeds $75,000.00;

g.      Entering an order against Defendants to abate or mitigate the PFOS and/or PFOA contamination that they caused through their AFFF Products at and around sites within the State;

h.      Ordering Defendants to pay for all costs related to the collection, return, and disposal of existing stocks of Defendants' AFFF Products, in an amount that exceeds $75,000.00;

i.      Voiding the Old DuPont Transfers to the extent necessary to satisfy the State's claims;

j.      Voiding the Chemours Transfers to the extent necessary to satisfy the State's claims;

k.      Awarding the State punitive damages in an amount to be determined by the trier of fact;

l.      Awarding the State costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

m.      Awarding the State such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

The State demands trial by jury of all issues so triable.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*Patricia V. Tipon*

PATRICIA V. TIPON
Attorney No. 0806170244
JULIE KUSPA
Attorney No. 0912160009
MATTHEW ZIMMERMAN
Attorney No. 8005010219
Assistant Attorneys General
Office of the Attorney General
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
patricia.tipon@maryland.gov
matthew.zimmerman@maryland.gov
julie.kuspa@maryland.gov
(410) 537-3061
(410) 537-3943 (facsimile)

ADAM D. SNYDER
Attorney No. 9706250439
Assistant Attorney General
Office of the Attorney General
301 West Preston Street, Suite 1101
Baltimore, Maryland 21201
adam.snyder1@maryland.gov
(410) 767-1409

JOHN KUCHNO
Attorney No. 851201343
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jkuchno@oag.state.md.us
(410) 576-7847

May 30, 2023

IN THE CIRCUIT COURT FOR Baltimore City
_____
(City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).
*Defendant:* You must file an Information Report as required by Rule 2-323(h).
***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☒ PLAINTIFF   ☐ DEFENDANT     **CASE NUMBER** _____ (Clerk to insert)

**CASE NAME:** State of Maryland <u>Plaintiff</u>    vs.    3M Company, Arkema, Inc. et al. <u>Defendant</u>

PARTY'S NAME: MD Dep't of Envt.,MD Dep't of Nat'l Res.,MD Dep't of Hlth.  PHONE: 410-537-3000

PARTY'S ADDRESS: 1800 Washington Blvd., Baltimore, Maryland 21230

PARTY'S E-MAIL: patricia.tipon@maryland.gov

**If represented by an attorney:**

PARTY'S ATTORNEY'S NAME:  Patricia Tipon and Julie Kuspa         PHONE: 410-537-3061 & 3352

PARTY'S ATTORNEY'S ADDRESS:  1800 Washington Blvd, Suite 6048, Baltimore Maryland 21230

PARTY'S ATTORNEY'S E-MAIL:   patricia.tipon@maryland.gov; julie.kuspa@maryland.gov

**JURY DEMAND?** ☒ Yes  ☐ No

**RELATED CASE PENDING?** ☐ Yes  ☒ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours  >30  days

### PLEADING TYPE

**New Case:**   ☒ Original         ☐ Administrative Appeal       ☐ Appeal
**Existing Case:** ☐ Post-Judgment      ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY *(Check one box.)*

**TORTS**
☐ Asbestos
☐ Assault and Battery
☒ Business and Commercial
☒ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☒ Fraud
☐ Lead Paint – DOB of
   Youngest Plt:_____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☒ Negligence
☒ Nuisance
☐ Premises Liability
☒ Product Liability
☐ Specific Performance
☒ Toxic Tort
☒ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment
   (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

☐ Government
☐ Insurance
☐ Product Liability
**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
   ☐ Commercial
   ☐ Residential
   ☐ Currency or Vehicle
   ☐ Deed of Trust
   ☐ Land Installments
   ☐ Lien
   ☐ Mortgage
   ☐ Right of Redemption
   ☐ Statement Condo
☐ Forfeiture of Property /
   Personal Item
☒ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☒ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT**
**PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate
   Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. - Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☒ Equitable Relief
☒ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance
   Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

CC-DCM-002 (Rev. 12/2022)          Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☒ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☒ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☒ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☒ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☒ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☒ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☒ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☒ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000          ☐ $10,000 - $30,000          ☐ $30,000 - $100,000          ☒ Over $100,000

☐ Medical Bills $_____    ☐ Wage Loss $_____    ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
A. Mediation          ☒ Yes  ☐ No
B. Arbitration        ☐ Yes  ☒ No

C. Settlement Conference  ☒ Yes  ☐ No
D. Neutral Evaluation     ☐ Yes  ☒ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*

### *(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time
☐ 1 day of trial time               ☐ More than 3 days of trial time
☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of          ☐ **Standard** - Trial within 18 months of
Defendant's response                                  Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

❑ **Expedited** - Trial within 7 months of Defendant's response   ❑ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ❑ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ❑ Civil-Short | Trial 210 days from first answer. |
| ❑ Civil-Standard | Trial 360 days from first answer. |
| ☒ Custom | Scheduling order entered by individual judge. |
| ❑ Asbestos | Special scheduling order. |
| ❑ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ❑ Tax Sale Foreclosures | Special scheduling order. |
| ❑ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | |
|---|---|
| ❑ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ❑ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ❑ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ❑ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

May 30, 2023
_____
Date

1800 Washington Blvd., Suite 6048
_____
Address

Baltimore          MD          21230
_____
City          State          Zip Code

_____   0806170244
Signature of Attorney / Party          Attorney Number

Patricia V. Tipon
_____
Printed Name